**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**(Charlotte Division)**

| | |
|---|---|
| MONTI ANTONIO S.P.A., : | |
| Plaintiff : | |
| : | |
| v. : | Civ. A. No. _____ |
| : | |
| SUBLITECH, INC. : | |
| d/b/a SUBLITECH AMERICAS, INC. : | |
| : | |
| and : | |
| : | |
| JOHN E. CARROLL : | |
| : | |
| Defendants. : | |
| : | |

## <u>VERIFIED COMPLAINT</u>

### PRELIMINARY STATEMENT

1.     Monti Antonio, S.p.A. ("Monti"), brings this action against Sublitech, Inc. and its principal, John E. Carroll, for breach of contract, breach of fiduciary duties, violation of the North Carolina Unfair and Deceptive Trade Practices Act, violations of the Lanham Act, and conversion of hundreds of thousands of dollars in sales revenue.

2.     Monti is a family owned business that manufactures and sells commercial-grade laminating, printing, finishing, and related equipment for use in the textile industry around the world.

3.     Monti has been in business for sixty years and is well-known for producing long-lasting and durable equipment and providing industry-leading service for its products.

4.     Monti has relied on commercial agents based in the United States to sell and service its products in the United States for several decades.

5.     From 2006 through early 2019, Monti's commercial agent in the United States was Carroll. Carroll acted both individually and through corporations that he controlled and that were his alter egos, including most recently Sublitech. He became Monti's exclusive commercial agent in the United States relatively soon after Monti and Carroll began working together.

6.     Carroll and Sublitech earned commissions on sales of Monti's products in the United States and were also responsible for post-sales servicing for all of Monti's machines sold to customers in the United States.

7.     Recently, Monti discovered that Carroll and Sublitech have been engaging in self-dealing by accepting payments from Monti's customers for orders Carroll and Sublitech had created and converting to their own use hundreds of thousands of dollars in sales revenue.

8.     In April 2019, Monti, through counsel, sent a letter to Defendants terminating their agency relationship and demanding that Defendants cease holding themselves out as a Monti's commercial agent in the United States.  Nevertheless, Sublitech and Carroll continue to advertise the sale of Monti's products in the "Sublitech Store," on Sublitech's website.

## JURISDICTION

9.      Sublitech is a North Carolina corporation with its principal place of business in Charlotte, North Carolina.

10.     Carroll is a citizen of Georgia and is the President of Sublitech.

11.     Monti is a public limited company, incorporated under the laws of Italy, with its principal place of business located in Thiene, Italy.

12.     The amount in controversy exceeds $75,000, exclusive of interests and costs.

13.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(2).

14.     This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 1338, because this

2

action involves claims arising under the United States Trademark Act of 1946, as amended, 15 U.S.C. § 1051, *et seq.* (the "Lanham Act").

15. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. §§ 1338(b) and 1367.

## FACTS

### Monti is Introduced to Carroll

16. In January 2006, Carroll, who was working for another company that sold printing machines manufactured in Europe, was introduced to representatives from Monti through a mutual acquaintance.

17. At that time, Monti was searching for a new commercial agent to sell and service its products in the United States.

18. Carroll met with Monti's representatives in February 2006 in Italy, and shortly thereafter, Monti appointed Carroll to act as Monti's commercial agent for the sale and service of Monti's products in the United States.

### The Agency Agreement

19. According to the parties' agreement, Carroll (or a corporate entity he created for the purpose, such as Sublitech) was to be paid a commission on the sales of Monti's products in the United States.

20. The commission was computed based upon a table that Monti provided to its commercial agents around the world (including Carroll) along with a price list; the price list and table were updated several times during the course of Monti's and Carroll's agency relationship.

21. Carroll, either individually or through Sublitech, was responsible for receiving payments, including down payments, from Monti's United States customers and sending those

3

funds to Monti.

22.     Carroll was not entitled to a commission on a sale until the sale price had been paid in full.

23.     Under the Agency Agreement, Carroll individually or through Sublitech, was responsible for meeting with Monti's customers and potential customers in the United States, determining what their needs were, and then sending that information to Monti. Monti would then develop an offer (the "First Offer") and send the First Offer to Carroll to negotiate with the customer. Carroll would negotiate with the customer and upon reaching an agreement on price, Carroll would transmit that information (the "Final Offer") to Monti, and Monti would decide whether to approve the Final Offer.

24.      Under the Agency Agreement, neither Carroll nor Sublitech were permitted to accept the Final Offer and enter into a sales contract on Monti's behalf, without Monti first approving the Final Offer.

25.     Under the Agency Agreement, neither Carroll nor Sublitech were permitted to deliver a product to a customer until *after* the customer made final payment for the product.

26.     Under the Agency Agreement, Carroll, either individually or through Sublitech, was permitted to provide shipping and other services to Monti's customers, on his own accord and for a fee that Carroll negotiated directly with the customers.

27.     Under the Agency Agreement, after a machine was delivered to one of Monti's customers in the United States, Carroll either individually or through Sublitech, was responsible for providing services to the customer, including, but not limited to, covered repairs to the machine and ensuring that any replacement part orders were timely transmitted to Monti.

4

**Carroll Operates as Monti's Agent Through Corporate Entities, Including Sublitech**

28.     In September 2006, Carroll incorporated a legal entity known as Performance Textile Resources Group ("PTRG") and worked through that entity as Monti's commercial agent in the United States.

29.     In April 2013, Carroll formed Sublitech, became its president, and began working through that entity as Monti's commercial agent in the United States.[1]

**Sublitech is Carroll's Alter Ego**

30.     Upon information and belief, Sublitech has never had any other officers, shareholders, or owners other than Carroll.

31.     Upon information and belief, Sublitech does not have any employees.

32.     Upon information and belief, Carroll has taken money customers paid to Sublitech and converted it to his own use.

33.     Sublitech has always been, and currently is, an alter-ego for Carroll.

34.     Given that Sublitech is merely an alter-ego for Carroll, the Court should pierce the corporate veil and hold Carroll liable for all acts omissions of Sublitech.

**Carroll and Sublitech Begin to Experience Financial Difficulties in 2018**

35.     Upon information and belief, Carroll and Sublitech began to experience financial difficulties in or about December 2017.

36.     On December 6, 2017, Carroll sent an email to Alessandro Silva (Monti's Sales Director) requesting that he be paid commissions on an accelerated basis by the end of 2017 because, according to Carroll, "I am finalizing an application for a line of credit with my bank for Sublitech. This will help me a lot in managing the payment of so many bills for the import of

---

[1] For a short period of time, PTRG and Sublitech were both operating.

5

machines…." A true copy of that email is attached as **EXHIBIT A**.

37.    In addition, on several occasions between late 2017 and the middle of 2018, Carroll caused Monti machines to be shipped from Italy to one of Monti's customers after only receiving a small down payment and not the payment in full. This was a violation of Monti's policies and express instructions, which allowed for shipment only upon payment in full.

38.    Neither Carroll nor Sublitech were authorized to take these actions under the terms of the Agency Agreement, and, except in a few instances[2] in which Carroll agreed to personally guarantee full payment, at no time did anyone with authority from Monti authorize Carroll/Sublitech to ship these machines without receiving final payment.

39.    Upon information and belief, as Defendants' financial situation continued to deteriorate from March 2018 onward, Defendants' pattern of unlawful activity in violation of the Agency Agreement (and state law) also accelerated.

**Defendants Breach the Agency Agreement and Convert Funds Owed to Monti**

40.    Later in 2018, Monti discovered that the Defendants had engaged in a wide range of unlawful activity, which caused Monti to lose hundreds of thousands of dollars and damaged Monti's business reputation in the United States.

41.    On July 12, 2018, Monti discovered that Carroll had caused Monti machines to be shipped from Italy to Monti's customers in the United States after only receiving a small down payment and not the payment in full—which was a violation of Monti's policies.  Monti immediately demanded Carroll cease that activity and Carroll represented that he would.

42.    Nonetheless, on November 27, 2018, Monti discovered that Carroll, individually or

---

[2] In those instances, if full payment was not received after shipping, Carroll agreed to forfeit his commission to make up for the difference between the down payment and final payment.  However, Monti's authorization was limited to these few instances.

6

through Sublitech, had deposited down payment checks for orders from Monti's customers into Defendants' bank accounts without transmitting any Final Orders to Monti related to those transactions. Defendants also never transmitted the funds from the down payments for those orders to Monti, and instead wrongfully kept the funds for themselves.

43.     In addition, Monti discovered that on multiple occasions between (at least) October 2017 and November 2018, Carroll received final payments from Monti's customer, but never transmitted the funds to Monti, and instead kept them in his own bank accounts. To cover this up, Monti fabricated copies of purported wire orders indicating that he directed his bank to wire funds to Monti, and those fabricated wire orders were sent to Monti with the intent to deceive Monti.

44.     Monti subsequently uncovered many instances in which Carroll either individually or through Sublitech violated the Agency Agreement and breached fiduciary duties owed to Monti by, *inter alia* processing orders in Monti's name with no intent of ever transmitting the orders or funds related to those orders to Monti (the "Fictitious Order(s)") and then converting the down payments for those Fictious Orders (and in at least one case converting the full amount paid by the customer), and entering into sales agreements without Monti's approval of a Final Offer.

45.     For example, on March 15, 2018, Defendants created a Fictitious Order when they accepted an order from Monti's customer, Positive Marketing, and represented to that customer that they were accepting the order on behalf of Monti, when in fact they were not. Defendants never told Monti about the order, and they never transmitted the $11,000.00 down payment that Positive Marketing paid. Instead, the Defendants kept those funds. Monti only learned about the order when Positive Marketing contacted Monti directly to ask why delivery of the order was several weeks late. Positive Marketing ended up canceling the order and instead purchasing from one of Monti's competitors. Thus, Monti not only lost revenue as a result of Defendants' actions,

but Monti's reputation was damaged.

46.     On another occasion, Defendants created a Fictitious Order for spare parts from Monti's customer, The Sign Zone, Inc., and accepted a payment for $11,088.69, but Defendants never remitted those funds to Monti.

47.     There are also transactions in which invoices remain only partially paid because Defendants, without authorization from Monti, shipped or caused Monti's products to be shipped to Monti's customers after only receiving a down-payment and not a payment in full, which is a violation of the Agency Agreement.

48.     The following chart represents each instance[3], now known to Monti, in which Defendants wrongfully shipped Monti machines, or caused Monti machines to be shipped, to customers in the United States without receiving full payment:

| Monti Customer that received Monti products that were wrongfully shipped by Defendants before full payment | Down payment remitted to Monti | Outstanding Balance Due to Monti |
|---|---|---|
| "Quantum" | $89,776.08 | $89,664.00 |
| Color Gamut  (Las Vegas, NV) | $1,120.80 | $66,911.76 |
| "Pictographics" | $8,406.00 | $42,814.56 |
| "MS" (2018 SGIA Fair Loaner) | $0 | $24,769.68 |
| "Terry Town" (2018 SGIA Fair Loaner) | $0 | $24,769.68 |
| "Mosaica" (2018 SGIA Fair Loaner) | $0 | $24,769.68 |
| Invoiced to The Sign Zone, Inc. (Brooklyn Center, MN)—delivery to "West America" | $24,769.68 | $57,822.07 |
| "Through 6" | $5,604.00 | $87,422.40 |
| Invoiced to "Vistalogistics"—delivery to "Czanowski" | $10,710.45 | $71,892.51 |
| Invoiced to "Global"—delivery to "Image Mill" | $11,208.00 | $77,783.52 |
| Calcomp | $1,173.48 | $341.84 |
| Sublitech | $0 | $376.81 |
| **Total Outstanding Balance Due to Monti** | | **$569,338.51** |

---

[3] Each of these transactions occurred from December 2017 to the present

8

49.     In addition to the unlawful acts summarized on the charts, above, upon information and belief, there may be additional unlawful transactions which Monti has not yet discovered.

50.     As a result of Defendants' wrongful and unlawful conduct and the creation of Fictitious Orders, Monti's customers expected the products they paid for in those orders to be timely delivered, and when those products were never received, Monti's customers looked to Monti to be made whole.

51.     Because Defendants wrongfully bound Monti to sales agreements with various customers that Monti had not actually approved, Monti lost significant profits and had to expend tens of thousands of dollars to fulfill those orders in a very short time frame.

52.     After being confronted with his malfeasance, on January 24, 2019, Carroll sent an email to Alessandro Silva, Monti's Sales Director in which he admitted that he was suffering from "severe financial problems" which have grown over time, and in other communications before and after that email, admitted his wrongdoing and agreed to address and resolve the problems he had caused.  A true copy of that email is attached as **EXHIBIT B**.

53.     Initially, from approximately December 2018 through March 2019, Monti attempted to work with Defendants and Monti's customers to remedy the problems Defendants had caused.

54.     However, Defendants, even after agreeing to refund stolen payments, failed to return all of the respective payments to Monti's customers, and refused to remit them to Monti. Thus, Monti lost profits because it had to credit customers with payments that Monti never actually received or provide steep discounts on replacement products.

55.     In addition, due to Defendants' unlawful and wrongful actions, Monti's reputation in the United States has been severely damaged.  For example, the representative for one customer,

9

Positive Marketing, wrote to Monti's Sales Director on February 4, 2019 and expressed his frustration, stating that "…this wasn't a great experience…there are many [sic] pissed off at Monti, and also some major players told me to stay away."

56.     At present, in an effort to repair the damage Defendants did to Monti's reputation and customer relationships, Monti is negotiating with several long-time customers to offer steep discounts and retain their business.  This will result in Monti losing future profits.

57.     Monti terminated its Agency Agreement with Defendants in April 2019, and it demanded that Defendants cease holding themselves out as Monti's exclusive agent in the United States.

58.     Nonetheless, despite receiving Monti's termination letter, Carroll continues to hold himself and Sublitech out as authorized agents of Monti in the United States.

59.     Defendants have continued to advertise Monti's products for sale on their website and, upon information and belief, have continued to represent to Monti's current and potential customers that Defendants are an authorized agent for Monti.

60.     For example, as recently as June 14, 2019, Sublitech's "Store" page on its website advertised for the sale of several of Monti's products.  *See* **EXHIBIT C** (PageVault Webpage Capture Files showing multiple new "Monti Antonio" products for sale on multiple pages).

61.     By clicking on an individual model offered for sale on the webpage, one is then directed to another webpage with instructions to "Contact Us for pricing information."  **EXHIBIT D** (PageVault Webpage Capture File of a collection of webpages offering individual Monti Antonio products for sale).

62.     However, neither Sublitech nor Carroll are authorized to act as the commercial agent for Monti to sell Monti's products, and they are not authorized to provide pricing information

10

to Monti's customers. By continuing to hold themselves out as Monti's agents, the Defendants are irreparably damaging Monti's goodwill and reputation in the United States.

**Defendants Are Using Monti's Trademark Without Authorization**

63.    For decades, Monti has continuously and exclusively used and promoted its products through its famous MONTI ANTONIO® trademark in connection with the design, manufacture, marketing, and advertising of, *inter alia,* its industrial machine presses, textile-finishing, calendars, bonding and laminating calendars, industrial hot-melt laminating machines, and machines for dyeing textiles.

64.    Monti's ownership of and exclusive right to use the famous MONTI ANTONIO® mark, as well as the mark's validity, is evidenced by the mark's United States trademark registration, Reg. No. 4963161.  *See* **EXHIBIT E** (USPTO Registration Summary for MONTI ANTONIO® mark).

65.    The MONTI ANTONIO® mark is incontestable and currently active.  *See id.*

66.    Monti has spent significant money and resources advertising and promoting its products and services throughout the United States and the world and expanding its business offering goods and related products and services under the famous and distinctive MONTI ANTONIO® mark.

67.    For example, Monti has advertised using the MONTI ANTONIO® mark at dozens of industry trade association fairs in the United States and Europe over the past several years.

68.    Accordingly, the MONTI ANTONIO® mark has become famous, distinctive, and associated with Monti's products.

69.    Monti has successfully developed and sold its products using the MONTI ANTONIO® mark.  Monti both adds to and relies upon the value and goodwill of the MONTI

11

ANTONIO® mark to derive income from its business activities.

70. On information and belief, Defendants are infringing on the MONTI ANTONIO® mark by continuing to advertise Monti's products for sale and continuing to hold themselves out as Monti's representative.

## COUNT I
### (Breach of Contract)

71. The allegations of paragraphs 1 to 70 are incorporated by reference.

72. The Agency Agreement constitutes a valid and enforceable oral contract between Defendants and Monti.

73. Monti performed all of its obligations under the terms of that contract.

74. Defendants breached the Agency Agreement by, among other things, causing products to be shipped to customers without obtaining full payment for those orders, switching the machines delivered for certain orders such that the serial numbers did not match the orders, engaging in self-dealing, failing to disclose the existence of purchase orders from Monti's customers, creating the Fictitious Orders using Monti's name to defraud Monti's customers, making false representations to Monti's customers that Defendants were authorized by Monti to act on Monti's behalf when in fact Defendants unlawful and wrongful acts were not authorized by Monti, and continuing to hold itself out as a commercial agent authorized to sell Monti's products.

75. Monti has been damaged by Defendants actions in that Monti has lost hundreds of thousands of dollars in revenue, its business reputation has been tarnished, and it has incurred consequential damages due to the need for it to provide products to its customers at a significant discount, causing Monti to suffer additional losses.

12

## COUNT II
### (Unjust Enrichment—in the alternative to Breach of Contract)

76.　　The allegations of paragraphs 1 to 75 are incorporated by reference.

77.　　 In the alternative to the breach of an express contractual agreement between Monti and Defendants, by agreeing to pay commissions to Defendants based on Defendants' sales of Monti's products to Monti's customers in the United States, Monti conferred a benefit on Defendants.

78.　　That benefit did not interfere with the affairs of Defendants, and in fact, benefited Defendants.

79.　　That benefit, as described herein, was not gratuitous and was measurable based upon set commissions and access to Monti's customers.

80.　　Defendants consciously accepted the benefits conferred by Monti with the understanding that for each sale that Defendants facilitated for Monti, Defendant would receive only their commission owed on the sale and would not retain the entire payment from the customer.

81.　　It would be inequitable for Defendants to retain the hundreds of thousands of dollars in payments they received from Monti's customers based on the Fictitious Orders (as set forth, above), and Defendants must be ordered to return those ill-gotten funds to Monti.

## COUNT III
### (Breach of Fiduciary Duty)

82.　　The allegations of paragraphs 1 to 81 are incorporated by reference.

83.　　 Defendants served as the commercial agent for Monti in the United States for several years, and at all relevant times to this litigation.

84.　　As the commercial agent for Monti in the United States, Defendants were in a special relationship of confidence with Monti, in which they were bound to act in good faith and

13

loyalty, with due regard to the interests of Monti.

85. Defendants breached their fiduciary duties, such as the duty of loyalty and good faith, to Monti by, among other things, embezzling funds, engaging in self-dealing, failing to disclose the existence of purchase orders from Monti's customers, creating the Fictitious Orders using Monti's name to defraud Monti's customers, and making false representations to Monti's customers that Defendants were authorized by Monti to act on Monti's behalf when in fact Defendants unlawful and wrongful acts were beyond the scope of their agency relationship with Monti.

86. As a result of Defendants wrongful and unlawful actions Monti has been damaged as set forth in this Complaint.

87. In addition, Monti is entitled to an equitable accounting, and the Court should order Defendants to account for all funds placed in their care by Monti's customers from 2018 to the present, all of which rightfully belong to Monti,

## COUNT IV
### (Conversion)

88. The allegations of paragraphs 1 to 87 are incorporated by reference.

89. At all relevant times, Monti was entitled to all payments from its customers, including those customers with which Defendants interacted as Monti's agent.

90. Defendants wrongfully converted hundreds of thousands of dollars of funds that Monti was entitled to by creating the Fictitious Orders, defrauding Monti's clients, accepting payments from those clients, and refusing to remit those payments to Monti and by failing to make Monti aware of orders created in Monti's name and for Monti's benefit.

91. As a result of these actions, Monti has been damaged and lost hundreds of thousands of dollars in revenue due to Defendants' conversion of monies that should have been

14

paid to Monti.

92.     In addition, based on Defendants willful and wanton actions in repeatedly deceiving and converting Monti's funds in total disregard for Monti's rights, Defendants should be ordered to pay punitive damages to Monti.

## COUNT V
### (Constructive Fraud)

93.     The allegations of paragraphs 1 to 92 are incorporated by reference.

94.     Monti and Defendants were in a relationship of trust and confidence.

95.     As a result of that relationship of trust and confidence, Defendants engaged in several transactions in which Defendants took advantage of their position of trust to hurt Monti by *inter alia*, concealing the Fictitious Orders from Monti and converting funds owed to Monti.

96.     By taking these actions, Defendants sought to benefit themselves.

97.     As a result of Defendants actions, Monti lost hundreds of thousands of dollars in revenue, and suffered significant injury to its business reputation.

98.      In addition, Monti is entitled to an equitable accounting, and the Court should order Defendants to account for all funds placed in their care by Monti's customers from 2018 to the present, all of which rightfully belong to Monti,

## COUNT VI
### (Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq.*)

99.     The allegations of paragraphs 1 to 98 are incorporated by reference .

100.     Defendants were regularly engaged in commerce with the State of North Carolina and in other states based on their business dealings with Monti and Monti's customers.

101.     Defendants engaged in unfair and deceptive acts in violation of the North Carolina

Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1 *et seq.*

102. Defendants unfair and deceptive acts in violation of UDTPA include, but are not limited to, creating the Fictitious Orders for Monti's customers, inducing those customers to make payments totaling hundreds of thousands of dollars to Defendants under the pretense that the payment would be applied toward the purchase of a product from Monti, and then failing to transmit the order to Monti while instead keeping the payments for themselves.

103. Defendants' conduct affected commerce in this state and elsewhere because, among other things, their actions significantly and negatively impacted the business of Monti and Monti's customers, and Defendants used the mails and wires to defraud Monti and Monti's customers.

104. Defendants' conduct in violation of the UDTPA also injured Monti by, among other things, causing Monti to lose hundreds of thousands of dollars in revenue, damaging Monti's business reputation in the United States, and causing Monti to lose customers.

105. Based on Monti's injuries sustained as a result of Defendants' conduct in violation of the UDTPA, Monti is entitled to treble damages under N.C. Gen. Stat. § 75-16, and to an award of its reasonable attorney's fees and costs under N.C. Gen Stat. § 75-16.1.

### COUNT VII
### (Trademark Infringement Claim under the Lanham Act, 15 U.S.C. § 1114)

106. The allegations of paragraphs 1 to 105 are incorporated by reference.

107. Monti is the owner of all right, title, and interest in the MONTI ANTONIO® mark.

108. Defendants' use of the MONTI ANTONIO® mark in the marketing, advertising or sale of Defendants' products is likely to cause confusion, reverse confusion, mistake, or deception as to the source, sponsorship, or approval of Defendants' products in the mistaken belief that Monti is somehow affiliated, connected, or associated with Defendants or their products.

109. Defendants' acts constitute trademark infringement of a federally registered

16

trademark in violation of the Lanham Act, 15 U.S.C. § 1114.

110.    Because of Defendants' Acts, Monti has suffered and will continue to suffer damage and irreparable injury to its business, reputation, and good will, and will sustain loss of revenue and profits, while Defendants profit from their prohibited use of the MONTI ANTONIO® mark.

111.    Because of Defendants' acts, Monti has suffered and will continue to suffer damage and irreparable injury to its business, reputation, and good will, and will sustain loss of revenues and profits, while Defendants profit from their prohibited use of the MONTI ANTONIO® mark.

112.    Unless and until enjoined by this Court, Defendants will continue to perform the acts complained of herein and cause immediate and irreparable harm, damages, and injury to Monti.

## COUNT VIII
## (Trademark Infringement Claim under the Lanham Act, 15 U.S.C. § 1125(a))

113.    The allegations of paragraphs 1 to 112 are incorporated by reference.

114.    Defendants' use of the MONTI ANTONIO® mark in the marketing, advertising, or sale of Defendants' products is likely to cause confusion, reverse confusion, mistake, or deception as to the source, sponsorship, or approval of Defendants' products in the mistaken belief that Monti is somehow affiliated, connected, or associated with Defendants or their products.

115.    Defendants' acts constitute trademark infringement of a federally registered trademark in violation of the Lanham Act, 15 U.S.C. § 1125(a).

116.    Because of Defendants' Acts, Monti has suffered and will continue to suffer damage and irreparable injury to its business, reputation, and good will, and will sustain loss of revenue and profits, while Defendants profit from their prohibited use of the MONTI ANTONIO® mark.

17

117.    Because of Defendants' acts, Monti has suffered and will continue to suffer damage and irreparable injury to its business, reputation, and good will, and will sustain loss of revenues and profits, while Defendants profit from their prohibited use of the MONTI ANTONIO® mark.

118.    Unless and until enjoined by this Court, Defendants will continue to perform the acts complained of herein and cause immediate and irreparable harm, damages, and injury to Monti.

## COUNT IX
### (Trademark Dilution under the Lanham Act, 15 U.S.C. § 1125(c))

119.    The allegations of paragraphs 1 to 118 are incorporated by reference.

120.    Monti's MONTI ANTONIO® mark is a distinctive mark that is famous.

121.    Defendants' commercial use of the MONTI ANTONIO® mark in the marketing, advertising, or sale of their products is causing dilution of the distinctive quality of the MONTI ANTONIO® mark.

122.    Defendants' acts constitute trademark dilution in violation of the Lanham Act, 15 U.S.C. 1125(c).

123.    Because of Defendants' acts, Monti has suffered and will continue to suffer damage and irreparable injury to its business, reputation, and good will, and will sustain loss of revenues and profits, while Defendants profit from their prohibited use of the MONTI ANTONIO® mark.

124.    Unless and until enjoined by this Court, Defendants will continue to perform the acts complained of herein and cause immediate and irreparable harm, damages, and injury to Monti.

Therefore, Monti demands judgment against the Defendants, jointly and severally, for the following relief:

1.    Damages in an amount to be determined at trial.

18

2.      Treble damages for violations of the UDTPA.

3.      Punitive damages in an amount to be determined at trial.

4.      Interest, costs, and a reasonable attorney's fee.

5.      A preliminary and permanent injunction enjoining the Defendants from holding
themselves out as Monti's agents, making use of Monti's trademark, or advertising
Monti's products for sale.

6.      Such other relief to which it may be entitled at law or in equity.

Dated: August 22, 2019                          Respectfully submitted,

                                                /s/ Bo Caudill
                                                Bo Caudill
                                                NC Bar No. 45104
                                                Weaver Bennett & Bland, P.A.
                                                196 N. Trade Street
                                                Matthews, NC 28105
                                                704-844-1400 – Telephone
                                                704-845-1503 – Facsimile
                                                bcaudill@wbbatty.com
                                                *Counsel for Plaintiff*

                                                Theodore J. Folkman
                                                (*Motion for Pro Hac Admission Pending*)
                                                **PIERCE BAINBRIDGE BECK
                                                PRICE & HECHT LLP**
                                                One Liberty Square, 13th Floor
                                                Boston, MA 02109
                                                617-229-5415 – Telephone
                                                617-313-7401– Facsimile
                                                tfolkman@piercebainbridge.com
                                                *Counsel for Plaintiff*

Andrew M. Williamson, Esq.
(*Motion for Pro Hac Admission Pending*)
**PIERCE BAINBRIDGE BECK
PRICE & HECHT LLP**
601 Pennsylvania Avenue, NW
South Tower
Suite 700
202-839-3531 – Telephone
202-463-2103 – Facsimile
awilliamson@piercebainridge.com
*Counsel for Plaintiff*


THIS SPACE INTENTIONALLY LEFT BLANK

## VERIFICATION

I, _MONTI VINCENZO_ , as the authorized corporate representative for Monti Antonio, S. p. A. ("Monti"), declare that I have read the foregoing Complaint and verify that Monti knows the facts alleged in the Complaint to be true and correct to be best of Monti's knowledge and belief, except as to any matter or thing alleged upon information and belief, under the penalty of perjury under the laws of the United States of America.

Executed on: July 31, 2019

_____
Signature

21